Turn to the next case on our calendar, Aleutian Capital Partners v. Acosta. Good morning. Good morning. May it please the Court, my name is Christoph Heisenberg for Aleutian Capital Partners. This is an appeal of a termination by the Department of Labor that Aleutian owes back wages to certain H-1B employees. And the facts in this case show that, in fact, the employee was paid in excess of the amount specified. But not in the increments and in the time specified by the statute and regs. Correct. And the issue here is as to whether or not the back wage obligation is the same as the obligation on what schedule to pay it. The right and the remedy is set forth explicitly in the statute. And as we heard in the prior arguments, the statutory provision by Congress governs. And that is at 8 U.S.C. 1182 N2D, which provides that if the secretary finds, after notice and opportunity for a hearing, that the employer has not paid wages, and this is the key, at the wage level specified under the application and required under paragraph 1, which is the LCA, the labor condition application, that the secretary shall order the employer to provide the payment of such amounts of back wages as may be required to comply with that labor condition application. That labor condition application in section 1 can be found in the record appendix at 44. And under the department's regulations, the obligation that is in that LCA can be expressed either on an hourly, a weekly, a biweekly, a monthly, or an annual level. In this case, the obligation in the LCA is expressed on an annual level of $65,000. Do you agree with the dissenting ARB judge's theory about cumulative wages, that an employer is entitled under the regs to prospectively overpay, and just so long as the employer never falls behind what the employees owed for the year, or do you think that on an annual basis what the agency needs to do is look at whether there's been an overpayment and the pro rata references are irrelevant, whether the agency should look at the end of the year as whether there's been an underpayment, and that the pro rata requirements are irrelevant? For purposes of determining whether or not there's a back wage obligation, it is whether or not the employer has paid on an annual basis as reflected in that LCA. You look at the end of the year? Yes. And so the employer could pay nothing for 12 months and then pay everything at the end of December and there would be no violations, is that your position? No, that is not the position. In fact, there are other remedies in the statute to which the schedule on which those payments are due have to be satisfied, and in fact, if- No less often than monthly. Correct. And if those conditions are not satisfied, then the other remedies that are set forth in the statute, that is in sections N1 and they talk about whether or not the violations are willful or not, but you could have a situation in which you do find that there was a violation of the statute and the payment on a monthly schedule as the regulations provide. However, the remedy for that is quite different. The remedy in those situations are if it's found to be a willful violation, there's a $5,000 penalty per instance. If it's found not to be willful, there's a $1,000 per instance- But if that reading prevails, then the employer's in a position of regardless of what the regulations say or what he's promised to the H-1B employee of just making economic calculus about whether it's cheaper or better suited to his cash flow needs to pay a fine at the end of the year or pay a certain amount towards compensation over the course of the employment. And that seems inconsistent with Congress's purpose of trying to protect American workers who wouldn't settle for that- those kind of payment conditions. Not quite. In addition to the monetary penalties, there are additional penalties of losing the ability to hire H-1B employees. So there are significant remedies that are provided for the failure to do so. And I'd point out, in this case, you actually have the opposite of that, which is you have front-loaded payments and to contrast that, for instance, you could have a situation where they say, we're going to pay the employee $65,000 for the year. They pay him that amount on the front end the first day, and then they're held in violation for the last 11 months of that period. And the remedy- and this is where the remedy is very important- the remedy, according to the government, would be you owe the 65, you know, less that one month, so $59,000 as back wages. That highlights the difference between a back-wage remedy, which Congress expressly stated- So your hypothetical is interesting, but, you know, why doesn't the same- the principle you draw from that apply to the employer who pays everything at the end? I agree that it is exactly the same issue, which is that whether or not there is a violation of the schedule on which these payments are to be staggered out is a separate and distinct issue, then, from the back-wage remedy. Congress specifically said in the back-wage remedy in Section D that you look to what has been specified in the LCA. And here, Appendix 44 expressly says it is the amount on an annual basis. Now there may be, you know, as we're highlighting here, there may be issues with the timing, and if the employer chooses to either willfully or inadvertently not hit those targets, the Secretary has various remedies that are in the statute for that. But the remedy- I agree that this is a timing- there's a timing violation. You should say that this is excused because in at least one case there was a bonus. Yes, that certainly- the timing regulations were not satisfied. But the remedy that is being requested here is one that doesn't fit whatever the violations are. That is the remedy- and again, the statute governs, and the statute says you look to see the back wages shall provide the payment of such amounts which are the amounts specified in the LCA. And the LCA here is on an annual basis, and there is no deficiency in this case. Now it could be, as we say, and as we've highlighted, that there are various other remedies that are in the statute to determine whether or not the employer is willfully doing this or inadvertently doing this. What the government, I take it, argues is that there really is no documentation here that adequately memorializes this commitment to provide a 3% bonus, and that that documentation is a requirement in order for you to prevail in your argument. What's your response to that? That's just as to the timing issues. So that if you do wish to pay on a- to include the discretionary bonus, that you do need to document that. For purposes of this appeal, that is not the primary argument here, because as you stated, we're acknowledging that there was an issue with respect to the timing of these payments. However, the focus of our appeal here was really, what is the remedy from that? And the remedy that the government and that the Department of Labor ultimately came to is one that the statute does not allow. Thank you. Thank you. We're going to hear from the government. Good morning, Your Honors. May it please the Court, Benjamin Torrence, Assistant United States Attorney on behalf of the Department of Labor. One of the difficulties in this case is the shifting arguments that Aleutian is presenting. Their reply brief says that they assume there was a timing violation and focuses exclusively on what Mr. Heisenberg discussed today. The back-wage remedy. But the statute that provides for that back-wage remedy, paragraph N2D, is not cited or quoted or discussed in their opening brief. It was not discussed in the district court briefing. It was not discussed by the district court. It was not raised in the administrative proceedings. Counsel just told us, the opposing counsel just told us that the back-wage remedy is not permitted in this case. And that is something that he raised for the first time in the reply brief before this court. So, in our view, that argument has been waived. I will still be happy to go ahead and address it. The argument is based on the statutory language, as Mr. Heisenberg said, that provides that the wage level specified in the LCA, that's what triggers, the violation of that triggers the back-wage remedy. But that language simply doesn't support the argument. Simply saying that the wage level must be paid as specified in the LCA is silent as to the timing of when it must be paid. It's silent as to how it must be paid or whether it must be prorated. And I might point out that, for instance, if this employee had quit after six months, at which point he was thousands of dollars underwater after six months, if he had quit at that point, I very much doubt that Aleutian would be saying that they had to pay the wage level specified in the LCA, meaning the entirety of the annual wage. But let me ask, had he quit after six months, how quickly does an H-1B worker need to leave the country after leaving the employment that allowed him to be here? I don't have a precise answer for that. I'm wondering whether the person would have an opportunity to recoup or pursue remedies or whether the departure requirements are such that that would be illusory. Right. Well, certainly the Department of Labor would have the opportunity to do what it did here in a seek to recoup back wages on that employee's behalf. But looking at the facts of this case, after six months, in the first four months, this worker, Mr. Ganji, was grossly underpaid. He was paid as little as one-third of what was promised. As I said, they fell behind about half of his wages. He was about $10,000 underwater at a point when he was over. Well, they acknowledge the violations. They acknowledge the violations. So— They object to the remedy. They object. Now they're saying, as I said, they've shifted the argument to the remedy, but the statute simply doesn't support that, the language of the statute. And the regulation that interprets that statute is section 655.810. And that regulation says very clearly that a back-wage remedy can be imposed for violations of 655.731. And that's the regulation that contains the prorata requirement. So under the regulation, it's quite clear that a violation of the prorata monthly payment requirement can, in fact, trigger the back-wage remedy that the Department of Labor imposed. The— Why does it make sense still for the back-wage remedy in these circumstances to be so— result in such a large overpayment? It makes sense because, as I said, if the back-wage remedy ensures that workers, foreign workers, are paid what they were promised, again, if this worker had quit after six months, there's absolutely no reason to believe that they would have caught up and paid him. And that would have not only been unfair to him, but it would have undermined the wages of American workers, which, as the Court has pointed out, was an express purpose of Congress not to undermine the wages of American workers, to ensure that prevailing wages are paid. Are there any limits to your position? What if they had paid him 10 times the amount he was due for the first 10 months and then stopped paying him for three months? How would you handle that? So, you know, the— Aleutian has pointed to a number of hypotheticals similar to that. And I would point out first that, you know, in looking around at our history, we don't really see any examples of people doing that. People make mistakes. People make mistakes. They rarely do things like pay $72,000 on day one of someone's salary. They rarely pay 10 times as much. And I would simply point to that this is—at the end of the day, it's a law enforcement decision. It's a decision to investigate and enforce. And— So not the cases that the Department of Labor is reviewing? I'm sorry? Those are not—I mean, the cases, the types of cases that I think Judge Carney is rightly alluding to are not the cases that the Department of Labor is going to spend its resources reviewing? Exactly. The Department of Labor has enforcement discretion, like any law enforcement agency. So it may be a violation, but it's not going to— Right. And I would simply ask that if such a, I would posit, absurd hypothetical were to come before the court, the court would review it at that time. But having not seen a record of anything similar to that, I don't think it really sheds much light on this case, where, as I said, we have a worker who is very severely underpaid for many, many months. And in that case, in that situation, for the department to investigate and to assess a back wage is reasonable. It's certainly not arbitrary and capricious, which is the standard that this court applies. If the court has no further questions on the violation or the remedy, I would briefly like to address the investigatory authority of the Department of Labor. There are two issues there. There's the timing requirement. The statute sets forth a 12-month filing deadline for an employee in a grief or any aggrieved party to file a complaint. That's all it is. It's a filing deadline. It does not— How do you distinguish greater Missouri? That's the issue, because the circuit seems to be trending the other way from the position you're asking us to adapt. Certainly. So we can distinguish it on the facts, and we can disagree with its reasoning. On the facts, this is a far more limited investigation. In greater Missouri, they investigated based on one finding of reasonable cause as to something that wasn't—I think it was a benching violation as to one employee. They got basically all the records as to everybody in the H-1B program and found violations for at least three different types of violations for, I think it was, 44 separate employees. And the Eighth Circuit found that objectionable. But here we have something far, far smaller. We have a wage violation that was complained of to the department, and the department then asked for H-1B payroll records, which is a reasonable request given that it was a payroll violation that was alleged, and found one other employee for one month a violation with respect to that employee. So we don't have the kind of what the Eighth Circuit described as an open-ended investigation. It's not an objectionable, far-reaching investigation. But we do disagree with it on the law. We think that the Eighth Circuit read into the statute a limitation on the scope of investigation that is not there. And in fact, the statute does the opposite. It gives—it delegates to the Department of Labor very broad discretion to determine for itself how to investigate in response to an aggrieved party complaint. And the DOL, in fact, did take that delegation, an express delegation of authority, and promulgated a regulation that gives itself very broad discretion to determine, as the regulation says, as appropriate, as the Department of Labor deems necessary to investigate and enforce. That's not only consistent with the statutory text, but it's consistent with the purpose of DOL investigations in this type of case. The Department does not have the authority to investigate on the front end whether the certifications are incorrect. Their only ability to protect the wages of the H-1B workers and the prevailing wages of American workers is to investigate in response to these complaints. What's the limitation? The limitation is reasonableness. The limitation is whether they find reasonable cause. If there—if that were done in a way that is arbitrary and capricious, this court could review it, but that's not close to what we have here. I would point out— Would it be type of violation, maybe? You said that this was a payroll violation, and they inquired into another payroll violation where there were no limits at all on type of violation, or it was the whole H-1B program that they looked at in greater Missouri, right? As the Eighth Circuit described it, that's my understanding of what happened in that case, yes. I would point out, too, that in the particular context of H-1B workers, you have foreign workers whose visas depend on their employers, and they may be reluctant to report these violations. So, since the DOL's only investigatory authority is this back-end, post-alien admission investigations, if they see evidence—if they receive an aggrieved party complaint showing evidence that one H-1B worker is being systemically underpaid, it's reasonable for them to look to the other ones in order to prevent the kind of wide-ranging violations of the wage requirement that would do exactly what Congress sought to insure against, which is undermine the wages of American workers. The Eighth Circuit did not consider those purposes. They did not consider the regulation I cited, which is 655.810. I don't want to agree with you. Would we have to take the Eighth Circuit head-on? In terms of the legal principle, is there a way—I mean, you obviously referenced factual differences, but is there some other way to avoid creating a circuit split, I think is the term? That's the term I use. None is occurring to me. Off the top of my head, I confess I had not given that question much thought. We do think that the court can distinguish on the facts, as Your Honor pointed out, but as I said, the Eighth Circuit did read into the statute a limitation that's not there, and I don't know that there's any way to avoid disagreeing with that without disagreeing with it. Thank you, counsel. Thank you, Your Honor. Mr. Heisenberg, you've reserved three minutes for rebuttal. Thank you, Your Honors. If I could just address a couple of the points. The first is the question of whether or not the payments in other periods satisfy the obligations under the payment. That's governed by what's defined as the cash wages paid in Section 630—731, and that originally are not—once they have been made, they are no longer contingent, and therefore they satisfy the obligations for purposes of determining this. Now, there was various back and forth about whether or not—at what point the employee might have been terminated and might have been brought current. The record here, in fact, shows that within three to four months, when the end-of-year bonuses came due, Mr. Ganji was paid far in excess of those. So the intent of the elution capital here is really demonstrated not that there was any intent to take advantage of Mr. Ganji. And with respect to Ms.— Did she make any of these remedy-based arguments beyond the timing violation arguments in your opening brief? Yes. In fact, thank you for raising that. The issue of whether or not there was a remedy here was addressed by the dissent in the ARB. You can find that at the appendix, page 40. Yes, but did you make the argument in your brief? Yes. The issue of whether or not payments in other periods count towards the obligation has been throughout—as I said, from in front of the ARB to in our opening brief. Where in your opening brief did you make that argument? On page 11, the heading says, the Department's argument about the timing of elution's wage payments does not impact that the wages were paid and must be included when calculating an award of back wages. And so on pages 11 through—page 13 has a heading, in any event, there was no violation of the regulation's timing requirements. So the remedy issue is on 11 through 13 of our brief. But—and that stems from the ARB's decision where the dissent states that the administrator's factual concession that he had been paid more settles that there was no underpayment in 2012 and ends the administrator's ability to secure summary decision on this point. And then further on it says, I agree with elution that the administrator is penalizing elution for paying more than required in the first quarter of the year. What was that being penalized for, for paying more? Well, this was the dissent saying that these payments do— I—well, I'd refine that slightly to say that—not that they violated their contract because they satisfied the annual obligation, but they violated the secretary's regulations as to when those would be paid. Timing regulations. Yes, exactly. But again, the remedy—the main thing here is that Congress specifies the remedy. And although there are other remedies available for the timing, the back wage issue— The council gave us a citation which says that this remedy is available. Well, and I disagree. First of all, the statute is very clear on that. But even as to the regulations, the regulations that are cited is 655.810, which simply talks about that the remedy shall equal to the difference between the amounts that should have been paid and the amounts that actually was paid to—or with respect to such non-immigrants. So the remedy, even the provision they are relying on, does not state what I think they're trying to say, which is that it includes a timing issue. It just simply reflects what's in the statute. That is, the remedy has to be based on what you promised to pay and what was actually paid. Thank you. Thank you both. I reserve decision.